CHRISTIAN W. FINCKE *et al* v. JULIA K. BUNDRICK.

No. 14,211.    (83 Pac. 403.)

SYLLABUS BY THE COURT.

FRAUD—*Sale of Decedent's Land by Executor to his Surety— Setting Aside.* A sale of real estate belonging to the estate of a deceased testator, made by an executor to the surety on his bond under 'an order of the probate court procured through the fraud of the executor, may be set aside at the suit of a devisee, even although the surety was ignorant of the dishonest conduct of his principal.

Error from Wyandotte district court; E. L. FISCHER, judge.   Opinion filed November 11, 1905.   Affirmed.

*Philip Erhardt,* and *L. W. Keplinger,* for plaintiffs in error.

*C. W. Trickett,* and *Samuel Maher,* for defendant in error.

The opinion of the court was delivered by

BURCH, J.: Julia Fincke died leaving a will in which she bequeathed her personal property in equal shares to her son, C. W. Fincke, and her daughter, Mary Bundrick, and devised her real estate, one-half to Julia,

the daughter of Mary Bundrick, and one-half to her son, C. W. Fincke. The will also contained the following provisions:

"My said son, Christian W. Fincke, is to have full power to handle, take charge of and collect the rentals of said real estate until such time as it shall be ordered to be sold by the court of proper authority, as it shall hereafter appear in said instrument that he is appointed as executor of this, my last will and testament.

"All costs and expenses of administration upon my estate shall be paid from the proceeds of the sale of the said above-described real estate, and the balance shall be equally divided as above stated."

This will was duly probated, and C. W. Fincke qualified as executor under it. His bond as such executor assured a faithful administration of the estate, and was signed by Christian Schoeller. Something more than a year after his qualification the executor presented to the probate court a petition for the sale of the real estate described in the will. The terms of the will were set forth, and the statement was made that the costs and expenses of administering the estate would amount in the aggregate to the sum of $410.17. No reference was made to any debts of the testatrix. An order of sale was granted, and further proceedings were had, resulting in a sale of the land to the executor's bondsman for the sum of $775. The sale was approved, and an executor's deed was issued and recorded.

Subsequently to these proceedings the executor made a final settlement of the estate. In his final account he brought forward against the proceeds of the sale of the land items of various kinds aggregating $799.91, but he acknowledged receiving rents from the real estate in the sum of $111.50, and therefore admitted having in his hands a balance of $86.59, one-half of which, or $43.29½, he said belonged to Julia Bundrick as a devisee of her grandmother's land. This accounting was approved by the probate court, but the executor did not pay to Julia her share of the money.

The account states that it was deposited in court, but she has never received it. During the time covered by the administration of the estate Julia Bundrick was a minor, and, so far as the record shows, without a guardian. She was unrepresented in the proceedings in the probate court, and she was ignorant of the sale of her property until after she became of age. After reaching her majority she discovered and investigated the facts, and brought the suit in the district court from which this proceeding in error arises.

In her petition, as it was finally amended, she related the foregoing facts, charged that at the time the petition for the sale of the real estate was filed the costs and expenses of administration amounted to only $64; that all other items of the $410.17 were falsely and fraudulently asserted against the land; that the order of sale was procured through the fraud and imposition of the executor upon the probate court; that the sale to the bondsman was a device by which the executor might himself acquire the entire title to the property; that the final account, by means of which the proceeds of the sale were more than consumed, was fraudulently concocted; and that the final settlement was fraudulent and void. The petition contained other attacks upon the validity of the probate proceedings and the conduct of the executor and his bondsman, and other allegations essential to the relief demanded were made. Such relief consisted in setting aside the probate proceedings relating to the sale of the land, canceling the executor's deed, placing the plaintiff in possession, decreeing partition, and awarding damages for rents and profits. After a trial the court granted substantially the prayer of the petition.

In this court the executor and his bondsman make the following assignments of error:

"(1) Said judgment was in favor of defendant in error when it should have been in favor of each of plaintiffs in error.

"(2) The court erred in overruling the motion of each of plaintiffs in error for a new trial."

The first assignment of error amounts to nothing. It merely asserts that the judgment was wrong. The only proposition contained in the motion for a new trial which the defendants argue in their brief is that the decision of the trial court is not sustained by sufficient evidence, and is contrary to law. That, therefore, is the limit of the present inquiry.

There is evidence in the record to show that the executor began his administration by filing a false inventory, in that he failed to list a note of $800 due from himself. After citation and a trial he was ordered by the probate court to include this note among the assets of the estate, whereupon he compromised with his colegatee for her interest in the personal property on a basis confessedly below its value. He then undertook to relieve the personal property of every kind of liability and to make the land, which had been charged with costs and expenses of administration only, bear all the obligations which the personal property alone should have paid. But apparently he was not satisfied with this. Conceiving that the surviving husband of the devisor had a one-half interest in the land, he obtained from such survivor a quitclaim deed of the real estate to himself. The deed, however, conveyed nothing, because the terms of the will had been assented to, and so he attempted to charge the sum paid therefor against the real estate. He included $100 of the amount in the "costs and expenses of administration" referred to in the petition to sell the land, and actually reimbursed himself to that extent from the proceeds of the sale. The decedent left no debts. It cost nothing to collect the assets of the estate, except those due from himself, and yet, upon his showing, the real estate—two lots appraised at $700 and $300, respectively—proved insufficient to meet the costs and expenses of administration. When the estate was finally settled he had title to all the personal property and his only bondsman had title to all the real estate.

The orders of the probate court by which this aston-

ishing result was accomplished appear to have been made in reliance upon the executor's sole oath to the truth and correctness of his accounts and proceedings. In the district court he was examined as a witness in reference to his conduct. The trial judge heard all he had to offer in his own behalf and saw his demeanor while testifying. It is not necessary to discuss the testimony in detail. So far as he is concerned the court had the right to conclude that the sale of the land and the final settlement of his accounts were insufferably fraudulent and utterly unsustainable.

On behalf of the bondsman, however, it is contended that he was not a party to his principal's fraud, or cognizant of it, and that the law enjoined upon him no duty to make inquiries, except to ascertain that the court had jurisdiction to grant the order of sale. The district court probably believed that the bondsman was implicated in his principal's fraud. He resided in Oklahoma at the time of the trial, and consequently his evidence appears by deposition. He was asked where he obtained the money with which to pay for the real estate, and he replied that it made no difference. He said he always had plenty of money; that he was not doing a banking business at the time of the sale; that he paid cash for his stuff, and used to carry a lot of money. He admitted that Fincke was in possession of his papers, looked after the insurance and repair of the property, and collected the rents accruing from it, but he was unable to give any accurate information as to when he had received remittances on account of rent or the amount of such remittances. When pressed for information upon those subjects he said: "That is my business," and "I don't remember." When an effort was made to trace the money supposed to have been derived from the sale the executor declared that he kept it in a separate bunch, part currency and part gold, in his pocket and in his house, for some years, and gave an excited account of

Fincke v. Bundrick.

how completely his house was equipped with burglar-alarms.

Under these circumstances it is difficult to say that the charge of a proceeding taking the form of a sale, but in fact manipulated by both parties for the benefit of the executor, is wholly unsupported by evidence. But, because of the view which the court takes of the nature of the relation existing between an executor and his bondsman when dealing with each other in reference to property of the estate, it is not necessary to rest a decision upon this ground alone.

By his bond the defendant Schoeller became surety to the beneficiaries of the administration proceedings for the executor's good conduct. In the language of the books, he undertook that his principal should "do a particular act," viz., administer his trust faithfully and without fraud. (1 Woern. Adm., 2d ed., § 255.) This promise was original and primary on the surety's part, and bound him from the beginning. (1 Brandt, Sur. & Guar., 3d ed., § 2.) The moment the executor by machination and deceit obtained a fraudulent order of sale, a duty was disregarded and a breach of the bond occurred. (*Green's Administratrix v. Creighton et al.,* 64 U. S. 90, 108, 16 L. Ed. 419.) Knowledge of the fraud was not necessary to make the surety responsible at law on his bond for the result. He is held to know every default of his principal (1 Brandt, Sur. & Guar., 3d ed., § 2) ; and, whenever a judgment establishing a *devastavit* against an executor is rendered, his surety is estopped to dispute it. (11 A. & E. Encycl. of L. 901.)

That the liability of both the principal and surety may be determined in the same proceeding and in a court of equity, if special circumstances similar to those involved in this case exist, is now the generally accepted law of the United States. (11 A. & E. Encycl. of L. 902.) If, therefore, the relief sought in this suit were upon the executor's bond, liability would immediately attach upon the court's finding that the order

to sell the land had been procured by the executor's fraud. This being true, it is difficult to perceive why a court of equity and good conscience should allow the surety to enter the breach made by his principal in the citadel of the plaintiff's rights, carry away the spoils of the fraud, and then, with the booty in his possession, urge the strict character of his contract against a demand for reparation.

So long as a surety keeps aloof from the conduct of the trust whose faithful administration he has guaranteed, and seeks no personal profit from it to himself, he may well stand upon the letter of his bond and refuse to be responsible except in damages. But the moment he abandons such an attitude and begins to deal with his own privy in the property of the estate he ought to be held to a knowledge of all facts vitiating the transaction of which his principal is aware, and ought to be stripped of all the fruits of any fraud perpetrated by his principal, precisely the same as the principal himself.

But little light is thrown upon this precise question by decided cases. In the case of *Halsted v. Hyman*, 3 Bradf. 426, decided by the surrogate's court of the county of New York in 1855, it was said that the surety on an administrator's bond may speculate in claims against the estate, provided no connivance with the administrator appear. This seems to be a dangerous rule; but, granting it to be correct, it does not reach the facts of this controversy. Other cases brought to the attention of the court relate to liability on the bond.

The problem involves the ancient antagonism between self-interest and integrity. (*Michoud et al. v. Girod et al.*, 45 U. S. 503, 555, 11 L. Ed. 1076.) One of the purposes of the law in requiring a bond to be given is that there shall be no fraudulent conduct to repair, and every possible safeguard to this end must be erected and maintained. So long as the surety is not allowed to speculate in the assets of the estate, or is obliged to

inform himself of all the facts if he does speculate, his sole interest is in the rectitude and fidelity of his principal. Open to him a prospect of gain by freely bargaining with his principal, and he at once becomes concerned in the disregard of all those austere principles which must govern the conduct of those who undertake the management of trust estates. He becomes exposed to every temptation that would beset the executor himself if he were allowed to profit from official acts, and, if he should yield, he becomes actively enlisted in the support of fraudulent conduct against which he has engaged to save the estate harmless. No such portent should be suffered to overhang the delicate relation of trustee, surety, and beneficiary.

It is not the purpose to declare in this case that a sale of land by an executor or administrator to his bondsman can be impeached merely because of the relations of the parties, if made in good faith under an order untainted by fraud. But the court is fully persuaded that a sale by an executor to his bondsman ought not to stand if made by virtue of an order procured through the fraudulent conduct of the executor, even although the surety be ignorant of the dishonest character of the proceeding.

Since it was not possible for the plaintiff to obtain relief in the probate court, administration having been closed and the executor finally discharged, the district court had jurisdiction to entertain her suit. (*Gafford, Guardian, v. Dickinson, Adm'r*, 37 Kan. 287, 15 Pac. 175; *McAdow v. Boten*, 67 Kan. 136, 72 Pac. 529.) In view of the foregoing, it is not necessary to decide the questions raised by the plaintiff respecting the jurisdiction of the probate court to order a sale.

The judgment of the district court is affirmed.

All the Justices concurring.