**BRIDGES v. REA et al.**

No. 6228—Opinion Filed May 16, 1916.

Concurring Opinion, July 10, 1917. Rehearing Denied July 10, 1917.

(166 Pac. 416.)

(Syllabus by the Court.)

1. **Indians—Indian Lands—Sale of Allotment—Evidence—Fraud.**

In a suit by a minor in ejectment and to set aside for fraud in their procurement certain proceedings of the probate court resulting in the sale of her allotment as a citizen of the Choctaw Nation and to clear her title thereto, evidence examined, and held sufficient to justify the court in setting aside the same for fraud, and that said deed is void.

## 2. Same — Cancellation of Sale Contract—Actions—Condition Precedent.

Assuming that plaintiff had no right to sue to rescind the sale without restoring the consideration, her offer so to do in her petition, wherein she "tenders back to the said defendant W. C. Rea the drug stock taken in exchange by her guardian for her lands," was all that the law required of her. But the deed being void, she was not required to return the consideration as a condition precedent to relief in equity; but aside from this, the absence of a showing that, at the time she brought the suit or the case was tried, she had in her possession any of the consideration received for the land, was sufficient reason for not requiring her so to do.

## 3. Same—Cloud on Title—Invalid Mortgage.

Where the proceedings for the sale of land, together with the deed issued pursuant thereto, are set aside for fraud in their procurement, and, pending the suit, the grantee in the deed set aside executes a mortgage upon the land described in the deed, and the mortgagee is made a party defendant, held, that the court erred in refusing to set aside both deed and mortgage and to clear plaintiff's title of them both.

Error from District Court, Johnston County; Robert M. Rainey, Judge.

Action by Ida L. Bridges, a minor, by her next friend, W. W. Wells, against W. C. Rea and another. There was a judgment for defendants, and plaintiff brings error. Reversed and remanded.

C. F. Green, F. P. Lieuallen, W. F. Schulte, and Newman & Lawrence, for plaintiff in error.

E. S. Kerr and J. F. McKeel, for defendants in error.

TURNER, J. On June 8, 1912, in the district court of Johnston county, plaintiff in error, Ida L. Bridges, a minor, by her father, W. W. Wells, as next friend, sued W. C. Rea and the Farmers' & Merchants' National Bank of Roff, defendants in error, in ejectment and to set aside for fraud in their procurement certain proceedings of the probate court of that county, resulting in the sale of 220 acres of land, described in the petition as her allotment as a citizen of the Choctaw Nation, and to clear her title thereto. The bank was made a party defendant by supplemental petition, which alleged, in substance, that the bank, pendente lite, had taken a mortgage on the lands from Rea for $6,297, which was asked to be canceled and also set aside. After answer filed, in effect a general denial and a plea by the bank that it was an innocent incumbrancer for value, issues were joined by reply. There was trial to the court and judgment:

"That if the plaintiff, Ida L. Bridges, shall, within six months from this date, pay to the defendant Farmers' & Merchants' National Bank of Roff, Okla., the sum of $5,000, with 6 per cent. interest thereon from this date until paid, then and in that event, the said deed of the said guardian, J. E. Bridges, and the said mortgage of said W. C. Rea be, and the same shall thereby and by the payment of said sum of money, be wholly canceled, vacated, discharged, and held for naught, and it is ordered that a certified copy of this judgment, showing the satisfaction hereof and the payment of said amount, be recorded in the office of the register of deeds of Johnston county, Okla., and the same, when recorded, shall operate to revest in the plaintiff absolute, complete, and perfect title in and to the premises above described; it is further ordered that the defendants shall be and remain in possession of said premises until the further order of court."

Both plaintiff and defendants bring the case here.

The court was right when he held the proceedings in question void for fraud in their procurement. On this point the evidence discloses that a short time prior to the commencement of the proceedings assailed, plaintiff was the owner of the land in question, worth about $10,000, and lived in Roff with her father. The defendant Rea also lived in Roff and was the owner of a stock of drugs of doubtful value which he was anxious to trade for plaintiff's land. While standing on the street one day in the company of a young man named O. W. Bridges, plaintiff passed. Observing her, Rea said to Bridges:

"Kid, there is a match for you right there, and she has sure got the land, too, and I will help you all I can. The next time I see her I will talk to her for you"

—all of which was agreeable to Bridges, who thereafter met and married her. After their marriage, the young couple went to live with his father, J. E. Bridges, at which time Rea approached the father and proposed a trade of the land for his stock of drugs; and to that end it was agreed between them that the father would qualify as guardian of plaintiff and consummate the deal through the probate court. Accordingly Rea had him appointed as such, and went on his bond with R. A. Rea, his brother, and J. C. Rea, his father, as sureties, after which the guardian petitioned the probate court for a sale of the land, with the understanding with Rea that he would bid in the land and give his stock of drugs and fixtures in exchange therefor; and the proceedings were carried to a point where the sale of the land was about to be made when it was interfered with, to some extent, by the appearance upon

the scene of an agent representing the commissioner of charities and corrections, who objected thereto and informed Bridges, the guardian, after acquainting himself with all the facts, that he ought to be in the penitentiary. His objections, however, were shortly thereafter overcome when Rea and the guardian consulted over the matter at Ada and placed $50 in the hands of a mutual friend named Richardson to give to the agent, which he did not get, or so he states, whereupon the agent disappeared and the sale "went through"; the order of court directing the guardian to sell the land at private sale to the highest bidder for cash. But before it went through, the guardian gave a sale bond, the sureties on which were notoriously insolvent, and Rea, together with an obliging friend, in order, he told the friend, to show by inventory that his stock was worth enough to pay for the land, "went through" it and marked it up and had an inventory taken showing the stock and fixtures to be worth $10,000 or more. The evidence further discloses that prior to the sale all parties concerned, except plaintiff, went to the probate judge, and, they say, told him all about the arrangement to trade the stock and fixtures for the land, to all of which he seems to have assented, and the order of sale was made.

At the sale, Rea, pursuant to the prior understanding with the guardian, bid $10,000 cash for the land, and the same was sold to him for that amount. Thereafter the guardian reported the sale to the court as a cash sale, and the same, as such, was approved, the order of sale reciting that the land was "sold to W. C. Rea upon the following terms, to wit: For the sum of $10,000, payable as follows: Cash on delivery of deed and abstract showing title." Shortly thereafter, although the purchase money was never paid, the guardian represented to the court by petition that it had been, and that he had the fund on hand to invest for the minor, whereupon the court entered an order, pursuant to the prior understanding between the guardian, Rea, and the judge, authorizing him so to do, in Rea's stock and fixtures, which he afterwards did by delivering to Rea a deed to the land and taking over his stock, allowing him therefor a credit on the purchase price of the land of $6,463.40, shown by the evidence to have been worth about $5,000, and a further credit of $4,546.60 for the fixtures, shown by the evidence to have been worth less than half that amount at the time of the sale; Rea taking back from him a mortgage on the stock and fixtures to secure the payment of $1,685.80. After that, Bridges took possession of the store contain-

ing the stock and fixtures, and conducted the business as guardian of plaintiff, and continued so to do for a short time, after which he made his final report to the court, in which he charged himself, among other things, with the stock of drugs and fixtures, and was discharged as guardian and the property turned over to plaintiff in settlement with the guardian. It is perhaps unnecessary to cite authorities in support of the assertion that the entire proceedings, including the guardian's deed issued pursuant thereto, were void as a fraud, not only upon the minor, but upon the court. However, we cite a few.

Tong v. Marvin, 26 Mich. 35, was a suit to set aside for fraud certain proceedings in the probate court, by means of which the complainant, who was an infant, had been divested of her title to certain of her lands. She complained that one Daniel Marvin, the ancestor of defendants, had procured his son, Lucius, to be appointed as her guardian, with the fraudulent intent to obtain for himself the title to her lands, and which he accomplished by means of a sale thereof, by order of the court. The facts were that the minor owed no debts in the state, but the land in controversy was incumbered by a mortgage which was in process of foreclosure. Whereupon Daniel Marvin advanced the money to his son to enable him as guardian to redeem therefrom and thereby furnish the excuse for an application to the probate court for a license to sell the lands. At the sale said Marvin became the purchaser; the sale realizing nothing for complainant over and above the redemption money and costs. She complained that the land was sold for considerably less than its market value, and that all the proceedings were taken, not in her interest, but to divest her of her rights, and were a fraud upon herself and upon the law. After defendants had taken issue upon the averment that Daniel Marvin had procured the appointment of his son as guardian, and upon the regularity of the probate sale and the price of the land, which defendants insisted was fair, complainant was granted relief, and upon appeal the decree was affirmed in an opinion by Cooley, J., who said:

"We are satisfied from the evidence that the allegations in the bill that Daniel Marvin procured the appointment of a guardian for complainant in the probate court, without the consent or knowledge of complainant's father or her other friends, and with a view secretly to obtain the title to her lands for his own benefit, are well founded. The probate proceedings, consequently, were not on behalf of complainant at all, or in her interest; but were a fraud upon her rights; and

as such it would seem that she should be entitled to have them annulled and vacated."

In Clark et al. v. Underwood et al., 17 Barb. (N. Y.) 202, the facts were: M. was the general guardian of certain infants who were the owners of an estate in fee in certain lands in remainder, subject to the life estate of their mother; that he, acting in concert with and by the aid and procurement of G., who had purchased the mother's life estate, and U., applied to the court and obtained an order authorizing the sale of the infants' interest in the land and appointing M. special guardian for them for the purpose of making the sale. At that time the mother was very sick and not expected to live, which fact was well known to M., G., and U., but was designedly concealed from the court. After the order of sale was made, M., as guardian, sold the property to U. for $8,675 82, including the life estate of the mother, which was estimated at $6,601.44, leaving only $2,028.38 to be paid to the infants as their share of the purchase money. The next day the mother died. On this state of facts it was held that the order appointing M. as guardian was fraudulently obtained, and the same and all subsequent orders and proceedings founded thereon for the purpose of obtaining the title of the infants to such real estate were set aside as fraudulent and void. In the headnotes in that case it is said:

"Fraud not only vitiates all sales and conveyances into which it enters, but the power and authority to sell and convey also, from whatever source derived.

"An order giving a party authority to sell and convey, fraudulently obtained from a court, is no better than a power fraudulently derived from the party whose rights are injuriously affected by it. It may always be annulled at his instance, upon establishing the fraud, at least as to all persons who were parties or privies to such fraud."

Bergin v. Haight, 99 Cal. 52, 33 Pac. 760, was a suit to quiet title in plaintiff to an undivided five-twelfths interest in a certain lot in San Francisco, of which he was conceded to be the owner, unless divested of his title thereto by an alleged sale of the lot by order of the probate court to one Gordon, under whom defendant Haight claimed title to the entire lot. The facts, as alleged and found by the court, were that the order of sale and confirmation thereof to Gordon was obtained by collusion of the administrator with Gordon and Haight; that the administrator was merely the passive and willing instrument of the defendant Haight, by which the latter, in fact, administered upon the estate, and, through Gordon, became the purchaser of the property at the sale. In affirming the judgment of the trial court, clearing plaintiff's title, the court said:

"The principal point made by appellant is that the evidence does not justify the finding of the fraud charged, but after a careful consideration of the facts and circumstances of the case, we cannot say that they would not justify a finding that the defendant Haight procured the appointment of Sander, and employed the proceedings in probate for the purpose of securing the title in himself; that he, in fact, administered upon the estate and through Gordon became a purchaser at his own sale."

Having been procured by fraud on the court, this deed was void. In Tirey et al. v. Darneal, 37 Okla. 606, 133 Pac. 614, in the syllabus we said:

"Section 6 of the act of Congress of May 27, 1908 (35 St. at L. 312, c. 199), providing that the persons and property of minor allottees of the Five Civilized Tribes shall, except as otherwise specifically provided by law, be subject to the control and jurisdiction of the probate (county) courts of the state of Oklahoma, is in the nature of a restriction by Congress on the alienation of land belonging to minor allottees, and as such can only be removed by a regular proceeding as provided by statute, through the instrumentality of the county court, and a deed executed by a minor, even though married, without any attempt to comply with such law, is void."

To be sure, in that case the deed was made by a minor direct to his grantee without the intervention of the county court. Here it is also made without the intervention of the county court, for the reason that the whole proceedings, including the order of sale and deed complained of, were procured by fraud, and for that reason had no existence in legal contemplation. For in Brown et al. v. Trent et al., 36 Okla. 239, 128 Pac. 895, we said:

"Fraud vitiates everything founded upon it, and when the fraud is established no court will give effect to a judgment so procured. In one sense it is not a judgment at all. Grantham v. Kennedy, 91 N. C. 148. The presumption is that the judgment would not have been rendered if the court rendering it had not been imposed upon, and the presumption applies with equal weight to the judgment of the highest and lowest court."

The whole proceedings, including the order of sale, the deed issued pursuant thereto, and the order confirming the sale, being void, it is unnecessary to determine whether the sale was void because not made for cash as required by Rev. Laws 1910, sec. 6567, or whether the agreement between the guardian and Rea to exchange this land, made in ad-

vance of any legal authority so to do, was void as against public policy, as contended.

Assuming that plaintiff had no right to rescind the sale without restoring the consideration, we think her offer to restore, made in her petition, wherein she "tenders back to the said defendant W. C. Rea the drug stock taken in exchange by her guardian for her lands," was all that was required of her. Clark v. O'Toole et al., 20 Okla. 319, 94 Pac. 547; Stevens v. Elliott et al., 30 Okla. 41, 118 Pac. 407.

There is no merit in the contention that, because of the fact that she appropriated to her own use and squandered, during her minority and before suit, a small portion of the jewelry taken from the stock, and is hence unable to restore it, she thereby ratified the sale, and is "estopped" to set the same aside. This for the reason that the deed was void. Where such is the case, as held in the Darneal Case, supra, the grantor is not required to refund the consideration therefor before asking relief in equity.

For the same reason, there is no merit in the contention that she is "estopped" to set the sale aside because of the fact that, after she made the offer to return the property, or so much thereof as she had not squandered during minority, she, by deed, assigned the same, subject to this "suit and tender as aforesaid," to a trustee for the benefit of her creditors (with claims aggregating $4,102.98), and who became such while the guardian managed the same for her, as stated. The Darneal Case was a suit to set aside a deed as a cloud upon title, executed by the minor without the intervention of the probate court. The minor had received some $1,500 as the purchase price for the land. The deed was void. To the contention that plaintiff should have been required by the court to restore the purchase money, the court said:

"Neither is it shown, at the time the answers were filed, or the case was tried, that Darneal had in his possession any of the consideration paid him for the land. This in itself would have been sufficient reason for not requiring him, in this action, to refund the purchase price or property received by him from Tirey."

We are therefore of opinion that the court did right in refusing to require plaintiff to restore any part of the property taken by her guardian in exchange for her land, and that she is not "estopped" to set aside the deed complained of by reason of her inability so to do. But in this connection it would seem that, as the deed to the land was void and passed no title from the plaintiff to Rea, so likewise no title to the goods passed from Rea to her, nor from her to her trustee

under her deed of assignment; and, as said deed of assignment was void and in no way affected defendant's rights in the property thereby sought to be assigned, the same might be recovered. But, as the trustee in the deed is not before the court, and, as said in Gilbert v. Hoffman, 2 Watts (Pa.) 66, 26 Am. Dec. 103, it is certainly not the duty of a court of equity to protect the interest of one who has been detected in an attempt at fraud, the trial court should have set the sale aside and restored the land to plaintiff and left Rea where it found him, and not only him, but the Farmers' & Merchants' National Bank, his mortgagee pendente lite.

It will not do to say that this is a collateral attack, and that the proceedings of the county court, which show a sale for cash, cannot be impeached by evidence aliunde, as we held in Ira Hathaway et al. v. John W. Hoffman et al., 53 Okla. 72, 153 Pac. 184. This for the reason that this is not a collateral attack, but a direct attack alleging fraud in the procurement of the proceedings. As to whether this is a direct or collateral attack was correctly decided and put at rest in Brown et al. v. Trent et al., 36 Okla. 239, 128 Pac. 895, which was a suit in the district court to quiet title to certain lands, and there, as here, the charge was that the order of court directing the guardian to sell the land was procured by fraud. It was there held that the attack was a direct and not a collateral attack. The court said:

"This proceeding is a direct attack upon that judgment. It is a suit, one of the ultimate purposes of which is to set aside the order of sale and the order confirming the sale. Bergin v. Haight, 99 Cal. 52, 33 Pac. 760; Campbell-Kawannanakoa v. Campbell, 152 Cal. 201, 92 Pac. 184. It is alleged that the orders were procured by fraud, and a portion of the prayer is that they be canceled and set aside."

And further on in the opinion:

"But an attack upon a judgment for fraud in its procurement is a direct attack over which courts of equity take jurisdiction, and no well-considered case can be found in which such jurisdiction is denied. See Sharp v. Danville, etc., R. Co., 106 N. C. 308, 11 S. E. 530, 19 Am. St. Rep. 533; Uzzle v. Vinson, 111 N. C. 138, 16 S. E. 6. The case of Bergin v. Haight, 99 Cal. 52, 33 Pac. 760, was a suit brought to quiet title, in which it was attempted to cancel a probate sale upon the ground of fraud. The court took jurisdiction and canceled the sale upon that ground. See, also, Coffey v. Greenfield, 62 Cal. 602; Reed v. Bank of Ukiah, 148 Cal. 96, 82 Pac. 845; Lataillade v. Orena, 91 Cal. 565, 27 Pac. 924, 25 Am. St. Rep. 219; Fincke v. Bundrick, 72 Kan. 192, 83 Pac. 403, 4 L. R. A. (N. S.) 820. The cases are very rare, and the circumstances very unusual, when the jurisdic-

tion of a court of equity to cancel any sort of contract or judgment procured by fraud cannot. be invoked. 1 Story, Eq. (15th Ed.) 194."

Being a direct attack for fraud, the truth of the sale cannot be covered up by the recitals in the record that it *was made for cash, when the truth is that the proceedings were procured by fraud and the sale was otherwise than for cash. In Ferguson, Gdn., v. Shepherd, Adm'r, 58 Miss. 804, under the decree of the probate court directing the guardian to sell his ward's land for cash, he sold it half for cash and for the other half took the purchaser's promissory note. He reported it as a cash sale, and the same was confirmed as such, and 'a deed, so reciting, was executed to the purchaser. He having failed to pay his promissory note, the guardian filed his bill to subject the land to a lien which the statute gave upon lands sold by guardians under judicial decrees for the purchase money thereof. A demurrer was sustained to the bill, on the ground that the sale was for cash and the statutory lien attached only where the sale was on a credit; but on appeal the case was reversed, and it was held that the sale was part for cash and part on credit, and that, as between the parties thereto, their heirs or grantees with notice, the truth of the sale could not be covered up by the recitals of the record, nor the statutory lien arising thereupon defeated. In reversing the case the court said:

"The land was not sold for cash, though it was so directed by the decree and so reported to the court. Property is really sold for cash only where the cash is paid. Here, a part only of the bid was paid, and the note of the purchaser taken for the remainder, so that between the parties, no matter what the recitals of the record were, it was actually sold and bought partly for cash and partly on credit. If the rights of third persons had intervened, such rights would be protected by the recitals of the record; but between the parties the truth cannot be cloaked and defeated by false recitals."

We are therefore of opinion that the court did right in setting aside the deed complained of, but erred in requiring plaintiff, as a condition precedent to the relief prayed, to pay $5,000 in liquidation of the mortgage held by Farmers' & Merchants' National Bank of Roff. This for the reason that it is conceded the bank was a_ mortgagee pendente lite, and hence is not entitled to receive the protection of an innocent incumbrancer for value and without notice.

The cause is therefore reversed and remanded, with direction to the trial court to enter judgment for plaintiff and put her in possession and clear her title, not only of the deed in question to Rea, but of the mortgage held by the bank, and to tax Rea and the bank with the costs.

All the Justices concur, except SHARP, C. J., whose views are expressed in separate opinion.

SHARP, C. J. (concurring). I think the sale made by the guardian void, because in contravention of section 6567, Rev. Laws 1910, requiring that:

"All sales of real estate of wards must be for cash, or for part cash and part deferred payments, not to exceed three years, bearing date from date of sale, as, in the discretion of the county judge is most beneficial to the ward."

That the lands were in fact exchanged and not sold is not seriously questioned.. Counsel for defendants in error in their original brief concede as much when they say:

"We deny that technically the drug store was exchanged for the lands, but contend that the record shows that the lands were sold for $10,000 and the proceeds were invested in the drug store and fixtures, and that the record cannot be collaterally attacked, and that these matters are not open to proof." ·

The defendant in error Rea, while on the witness stand as a witness for the plaintiff in error, concerning the transaction involving his disposition of the drug store, testified:

"Q. Now, at the time you sold this stock of drugs who invoiced it—what was the trade between you and Bridges on that piece of land? A. Well, I bought it with this understanding: that if it went through the court properly I was to give him $10,000. Q. In what? A. Virtually it was a trade. Q. What were you to pay the $10,000? A. In cash value of the drug store. Q. That was the trade? A. Yes, sir. Q. Did you ever give him a check at any time? A. No, sir. Q. Did you have him indorse a check? A. No, sir. Q. Did you give him any money? A. No, sir. Q. Now this stock invoiced a little better than. $11,000? A. I think so. Q. And you allowed him $10,000 for the farm and what went with the other $1,000? A. I retained a lien on the fixtures."

J. E. Bridges testified in respect to the trade as follows:

"Q. I will ask you to state if before the appointment as guardian of Ida L. Bridges if you had a conversation with the defendant W. C. Rea. A. Yes, sir. Q. Tell to the court that conversation. A. Well, I had several conversations with him, but the first one I had was in the drug store. Q. At what place? A. At Roff, in Rea's drug store, and he asked me if I would like to trade the land for the drug store. Q. What land? A. Her land. * * * Q. What was stated in

the second conversation, if you remember? A. In the second conversation he asked me if I had made up my mind to make this deal, and I told him that I could not make this deal; that I had no authority, and he said, well, I could be appointed guardian and get the deal through that way. Q. Do you remember anything else in the conversation? A. I told him that I was a stranger there, and did not know many people and there would have to be a bond made, and I did not know whether I could make one, and he said he would make one. Q. He did—who did make the bond? A. He did; W. C. Rea. Q. Who is on it? A. His father and brother. Q. When you agreed with Will Rea to take the farm for the drug store do you remember when that was? A. No, sir; I don't remember exactly when it was—it was about the 1st of October, maybe before that. Q. What was he to give you for the farm? A. Well, he was to trade me the drug store for the farm. Q. What did you and he agree that you would show in the court papers that he paid you? A. Ten thousand dollars. Q. After the sale was complete did he pay you any money? A. No, sir. Q. Explain to the court what action, if any, he went through with. A. As well as I remember he had a check run out for $10,000. Q. Did you see it? A. I saw it with the other side up—if it was a check at the time the deed was signed that was the time—when they signed the deed he said, 'Sign that too.' Q. The check was blank side up? A. Yes, sir. Q. What did Rea say it was? A. He never said what it was. Q. What did you understand it was? A. He said, 'Indorse this.' Q. What did you understand it was? A. I understood it was a check. Q. From whom? A. It was from him. Q. For what? A. For $10,000. Q. And to pay for what? A. Well, it wasn't to pay for anything, it— Q. What was it supposed to pay for? A. Why, we were playing like it paid for—Mr. Rea said the law was that the deal was to be a cash consideration, but as this was a trade, we would have to use this check to make the trade stand up. Q. What went with that check? A. I don't know; I never saw it any more. Q. Do you know who got it? A. No, sir. Q. What, if anything, in the way of money did you receive? A. Nothing at all. Q. Was an invoice taken of this drug store when you took possession? A. I taken possession on the 1st of January, and we commenced taking inventory on the 1st of January."

In view of this and other testimony of like character, it would be a travesty upon justice, a reproach upon the law, to treat the transaction as a guardian's sale for cash, or for part cash and part deferred payments. It was neither, but on the other hand, a disingenuous fraud practiced by the parties, whereby an attempt was made to circumvent the statute by making the transaction appear lawful upon its face. Schemes laid by designing persons to acquire by questionable means and in violation of law the birthright

of helpless Indian minors are morally repellent, and deserve the sternest rebuke of all good citizens, as well as of those in authority. So long as the rights of innocent third parties are unaffected, those engaged in such nefarious practices will not be allowed. to profit by them. This much may as well be understood by those who indulge in such transactions. Guardians' sales may be made in the manner and for the consideration named in the statute, and not otherwise. When the statute fixed the consideration for which the real estate of minors under guardianship could be made, it provided the exclusive consideration, and the court was without power either to authorize or confirm a sale made upon a different consideration; and that without regard to the recitals appearing of record, respecting the transaction made for the purpose of covering up the true consideration for which the sale was made. In Moran v. James, 20 Misc. Rep. 235, 45 N. Y. Supp. 537, the Supreme Court of New York, Special Term, held that section 2348 of the Code of Civil Procedure of that state, authorizing the sale or mortgage of an infant's land, did not authorize an exchange, and that therefore a mortgage on land taken by an infant in exchange, executed as part of the transaction, was invalid. On hearing before the Appellate Division of the court in 21 App. Div. 183, 47 N. Y. Supp. 486, it was again held that the statute did not authorize an exchange of the guardian's real property. That the county court had no power in the matter other than that given by the statute, which provided that the real property, or an estate therein, belonging to an infant, "may be sold, conveyed, mortgaged, released, or leased in the manner prescribed," and that the contemplated execution of such power was that the sale be made for cash or its equivalent, that the proceeds might be invested. In Perin v. Megibben et al., 53 Fed. 86, 3 C. C. A. 443, in an opinion by Taft, Circuit Judge, it was said to be the settled rule in Kentucky that the powers of the equity courts to sell and reinvest an infant's real estate were not inherent, but were merely statutory, and that the statutes must be strictly followed or the proceedings were a nullity. It seems that by section 489 of the Civil Code of Kentucky (Carroll's Code Ky. 1889, p. 235), an infant's real estate could be sold by a court of equity (1) to pay debts of an ancestor; (2) to pay his own debts; (3) in an action by the guardian for the ward's maintenance and education; (5) in an action against the infant by his

guardian for the sale of real estate and investment in other property. By section 19, art. 2, c. 48, of the General Statutes of Kentucky, as amended March, 1884, courts of equity were limited in the investments which they might authorize guardians to make of the money of their wards, to real estate or stocks or interest-bearing bonds of the United States, state of Kentucky, or some county or town of the commonwealth; and it was held that the Harrison chancery court was without power to exchange the beneficial interest of the minor heirs in real estate for shares of stock in a corporation; that the question was not one of irregularity, but as the power given was clear and specific, limitations upon its exercise must be strictly followed or the proceedings were a nullity.

In Walker, Ex'r, v. McLoud, Trustee, 204 U. S. 302, 27 Sup. Ct. 293, 51 L. Ed. 495, the opinion of the Circuit Court of Appeals, involving an analogous question (138 Fed. 394, 70 C. C. A. 534), was sustained. There the sheriff of Tobucksey county, Choctaw Nation, sold certain property of the Choctaw Coal & Railway Company in the trustee's possession, upon credit, whereas the act of the Choctaw Legislature of October 30, 1888, provided that the sale should be made "to the highest Choctaw citizen bidder for cash." It was held that the sale was a clear violation of the statute under which alone there was authority to sell at all, and was therefore absolutely void. We need cite no more authorities in support of a proposition involving so fundamental a principle. As between the parties and those who acquired interest in the subject of the litigation with notice, as did the Farmers' & Merchants' National Bank, they are bound, in making their defense, by the statute authorizing the sale, and upon which their rights must depend. As this statute was plainly disregarded, and as no effort, in fact, was made to sell the real estate for cash, but instead to exchange it for a drug store and fixtures, neither Rea nor the bank has such standing as will entitle them to relief in a court of justice. While the decree of the trial court was right in canceling the guardian's deed, it was error to require, as a condition thereof, the payment by plaintiff of the amount of the bank's mortgage.

For this reason, aside from any question of actual fraud, the judgment of the trial court must be reversed.